All right, final case of this morning is number 23-20543, Benfer v. City of Baytown. We'll hear first from Mr. Johnson. Good morning, and may it please the court. Good morning. Officer Calvert abandoned his fellow officers to, at worst, issue a ticket for a minor traffic violation. He ultimately sicced his attack dog on Mr. Benfer without a proper canine warning, despite the fact that Mr. Benfer never posed any threat. And he continued to allow his dog to bite Mr. Benfer long after he became compliant. To that end, appellant has three main points. First, Calvert's use of near-deadly force in the form of his attack dog constituted an excessive use of force due both to the initial decision to sick his attack dog on Mr. Benfer and due to the extended nature of the bite. He was resisting. Your Honor, at what point are you referring to resistance? Well, for one thing, when he was told to stay near his vehicle, he didn't do it. Right, Your Honor. So there's a couple issues tied up in that. But if we fast-forward to when the bite command was issued, that's when we're going to evaluate and analyze whether or not the use of force was justified. When the bite command was issued, Officer Calvert had at that point used a lower level of force. He used open-hand techniques. He had pushed Mr. Benfer and Ms. Wilson into the bush. And when he had issued the bite command, at that point he had had Mr. Benfer kind of by the scruff of his neck, and Ms. Wilson was on the ground. So through those open-hand lower force techniques, the scene was more under control, first of all, than when it began, but it was also more under control than after the dog was released and the bite began. Moreover, the bite command was issued without a proper canine warning. He said, I have a dog and it will bite you. But it was a generalized threat that he had a dog, as opposed to a specific directive for Mr. Benfer to comply with. And even if there was a specific... Who's to think when the officer says, I have a dog, come pet my dog and be nice to him and feed him a bone? I mean, come on, I have a dog. Of course he's... Right. He will use it if he needs to. That's correct, Your Honor, use it if he needs to. But what the case law describes and the case law requires is a specific directive that the plaintiff has an opportunity to comply with. And that's what was absent, as opposed to a generalized statement that he has a dog. Moreover, again, looking at the specific instance in which the bite command was issued, there was nothing further that Mr. Benfer could have done at that moment. There was nothing that Mr. Benfer did or didn't do from the video that precipitated the release of the dog. So at the moment, again, that the bite command is issued, he's holding Mr. Benfer by the back of the neck and Ms. Wilson is on the ground. So the generalized threat of the dog 12 seconds earlier, which, again, even if there had been a specific directive, would not have been a reasonable amount of time to comply with such a directive. There was nothing in that moment that necessitated an attack, nor was there anything leading up to it. You mentioned, Your Honor, that he was walking away from his car and walking away from Officer Calvert toward his home, but he was doing no more than that. There was no threat to Officer Calvert at any point. There was no bystanders that I can recall in the video, or any weapons, anything of that nature. So the escalation of force typically requires a threat on behalf of the person the force is using. Are you saying that if a person walks away from the officer, continues walking away from the officer, ignores repeated calls not to walk, oh, by the way, after he ignored the call to stay in the car, so he just completely defies him, that somehow all the officer can do to pursue him is walk? Otherwise, it's excessive force. So, Your Honor, that's exactly kind of the nub of the issue here. The escalation of force is, first of all, supposed to be measured in ascending, as opposed to going from what we had here, open-hand techniques, which, again, were yielding results. At the time that, again, the bycommander was released, Officer Calvert had used open-hand techniques in the form of pushing both of them into the bush and in the form of physically holding on to Mr. Benfer that were yielding results. So that level of force— —were the results that his wife went after, so he thought, his pistol belt. Your Honor, that fact was asserted in the police report, but it was not in the complaint or asserted— Well, it's certainly all over Judge Hanen's opinion. It is all over Judge Hanen's opinion, Your Honor, and that is one of the errors that the appellant believes that he made, is over-relying on Officer Calvert's own statements that are not supported by either the video or the pleadings, because this is, of course, at the motion-to-dismiss stage, so we're looking primarily at the pleadings, and because we have a video that was properly introduced, we're also— Are you suggesting the video portrays a compliant individual? I'm suggesting that the video does not portray Ms. Wilson reaching for the gun belt, at least not clearly enough. So you're not disputing that both Benfer and his wife were not complying? That may or may not justify a certain level of force, but, I mean, they weren't complying. Come on. Right. So, yeah, they weren't complying, and the caveat that I would add to that, Your Honor— Just to be clear, you had said at the outset of your remarks that this was nothing more than a traffic stop? Correct, Your Honor. I thought that was a stolen car, or at least the officer had an understanding. Maybe that was flawed. It sounds like it may have been flawed, but it wasn't just a traffic stop, was it? Your Honor, the traffic stop was, to your appellant's knowledge, the main driver of Calvert deciding to pull over Mr. Benfer and Ms. Wilson. He had later claimed in the police report that he thought it might have been a stolen vehicle, but as we described in the attachment to our complaint, if that were the case, first of all, the standard protocol is to report that over the radio, which never happened. So we have no objective evidence that he thought that and was acting on that. And secondly, it was for— Your theory is that's after the fact? Right. Correct. And additionally, the bullo that he cited was for Toyota, and the car that he pulled over in plain view was a Mitsubishi. So, I mean, even if that was part of his decision to start following Mr. Benfer and Ms. Wilson into the apartment complex, it would not then have justified the stop. I assume you'd agree, though, that a normal traffic stop, the driver complies, there's no movement, and things don't proceed. There's no need to escalate. This is a different traffic stop in that sense, isn't it? Your Honor, I would agree that it's a different traffic stop in that sense. I think he used profanity. It was not exactly a standard peaceful interaction with the officer. Yeah, I would agree that it's not a standard interaction with an officer, but I think that that also speaks to two facts. First is that Officer Calvert was a canine officer who doesn't typically make traffic stops, isn't typically tasked with making traffic stops, which I think is part of the reason that this traffic stop did go so far off the rails is because Acosta II wasn't experienced with making this kind of stop in this manner. But the second part of that that makes this traffic stop unique is the absence of specifically a lawful command or any kind of indication that they were not free to leave. So it was clear that he was asking them to do things, but throughout the encounter both Mr. Benfer and Ms. Wilson were justifiably confused as to what he was doing and why he was doing it, which speaks to the lack of clarity of his intent in his interaction with them. But turning back slightly to the excessive force analysis and more directly to your question earlier, Judge Jones, again, there was a lack of threat, a lack of a specific act, and I wanted to also bring up a hypothetical. You had asked, well, what's an officer supposed to do if somebody keeps walking away like that? Well, I think the answer is there are hundreds if not thousands of officers that make these kind of arrests and have these kind of interactions thousands of times a day without the benefit of a canine at their disposal. And they use open-hand techniques. They use their other tools that are available to them. So if we consider this case a hypothetical, if he didn't have a dog, if he had instead resorted to using a taser or a nightstick, I think, first of all, that's maybe a closer question, but again, even those cases turn on both the speed of escalation and the level of threat presented by the arrestee. In this case, again, no threat, and the escalation was about 12 seconds in the face of a lack of threat. And that hypothetical then also speaks to the egregiousness of the length of the bite. So the video shows that the bite lasted about a minute 40. There could be some quibbling back and forth about seconds here or there, but I don't think there's much dispute that about a minute 40 is a pretty fair approximation. There was a full minute of biting after Ms. Wilson was handcuffed, at which point Mr. Benford was on the ground with the dog on him. So Ms. Wilson was sitting handcuffed. Mr. Benford had the dog on him on the ground. A full minute elapses. The last 40 seconds of that minute is when Officer Calvert was attempting to handcuff him. Part of the reason that the handcuffing took 40 seconds was because the dog was physically obstructing him, and the dog was causing pain and causing these other issues that made it difficult for Mr. Benford to put his hands behind his back and do these other things, even though he was clearly trying to do those things. Do I understand there was a statement about an out command that the officer had attempted? I was trying to understand that better. So, yeah, it appears through the video, and this is something that would be fleshed out more during the discovery process of what the specific commands are between the dog and the handler, how much training the dog had with those commands, and how compliant the dog typically is to verbal commands like that. But it appears that there was some sort of attempt to verbally get the dog off, but the fact that the entire handcuffing took place, even though he was in proximity of the dog and could have pulled the dog off like he ultimately had to, shows that he could have gotten the dog off and ended the bite much sooner, even though the . . . What was the command that the officer used? I'm sorry, could you repeat? What was the command? I saw a reference, I think, to the report that your complaint attached that there was an out command, but I don't hear the word out. Yeah, there was a word . . . A gosh or something? It was a strange word. Something like that, yeah. Does the record reflect at this stage what that word means, if I'm even understanding that word correctly? Your Honor, that's again kind of what I was referencing. I think that that specific factual issue would need to be fleshed out in discovery of if that was the out or the off command, and if there was a lack of a . . . You, standing here today, you don't know what that word is intended to convey. It was repeated at various times during the video. Correct, Your Honor, and I think to . . . Yeah, so we don't have a factual allegation as to what that means. We can guess, but I don't think we need to at this point, because even in the light most favorable to the officer, which is, of course, not the standard, but even in the light most favorable to the officer, that doesn't help the situation when he could have physically removed the dog, like he, again, ultimately had to. Well, but granting that the word is currently ambiguous, as far as I'm concerned, if that word were to mean out, wouldn't that show that the officer was trying to get the dog to stop and was obviously unable to? Your Honor, because of the number of times it was repeated and because of his proximity to the dog at a time when the dog should have stopped biting, and when I say should have stopped biting, I'm referring kind of loosely to the Cooper v. Brown decision, where we're talking about a similar duration of a bite. It's one to two minutes, and this court held that the facts of the record say that permitting a dog to continue biting a compliant and nonthreatening arrestee is objectively unreasonable. I think that in the face of multiple, if they were failed commands, in the face of multiple failed commands when he was within reach of the dog and able to pull it off, that's certainly within the ambit of Cooper, where he had the opportunity, the ability to end the bite, but chose not to. So to be precise, does your complaint consist of A, sicking the dog in the first place, and B, unduly long bite? Yes, both of those... Both of those. Both of those, independently and in conjunction, lead to the excessive force claim. If the court were to look at this and say, you know, he was resisting whatever else, the initial bite was justified, the duration of the bite, especially under Cooper, where, you know, we have a lot of similarities. We have a nonthreatening arrestee... But you keep mentioning Cooper. Just to understand, though, if this command, fagosh or whatever the term is, was in fact the out command, and that's obviously not on the record, what more are you saying the officer should have done at that point under Cooper? Physically remove the dog. And where in Cooper... I see in Cooper a standard fair, once a person is compliant, you have to stop using force. Fair enough. That's really not all that groundbreaking. Right. What I don't see, and tell me if I've missed it, is beyond the out command, there's more that the officer needs to do. Obviously it's unfortunate the dog wasn't complying, but what more is established at that point? Right, so what Cooper establishes is not... at least the way that I read it, not specific to the out command, it's specific to the permission of the dog to continue biting, because the dog... Right, but under this understanding, and I shouldn't take up your time, if the officer was trying to get the dog to stop, the dog wasn't listening, what more does Cooper require? Maybe it should be required going forward, but it's not under Cooper, is it? So, Your Honor, again,  deals with the general principle of the length of bite and whether or not a bite should continue for... The officer needs to try. Right, but... I guess what I'm wondering is maybe the officer did try. Yeah, I was about to say, that's a question for discovery, Your Honor, and for... I know your red light is on, but let me just go ahead and ask you. Am I understanding you to be saying that there was no justification at all for use of the dog here at any time? Correct, Your Honor. Again, it's the use of the dog at all is the first part of the claim, the second part of the claim. It wasn't proper. Even while Benford was... I mean, even while the officer was dealing with Benford's wife during that instance, it was not legitimate to use the dog to subdue Benford during that... Correct, Your Honor. That's correct, because he was not posing any threat to the officer or anybody else at that point. So, even if, you know, as Judge Hanen pointed out, the officer claims that Ms. Wilson was reaching for his gun belt, that threat was not posed by Mr. Benford. If you wanted to use the dog on Ms. Wilson, it could establish that she was, in fact, reaching for his gun belt, which is not the facts before us, but if it was, then, you know, maybe we have a different question, but it was never... It was never a question that Mr. Benford posed any level of threat to Officer Calford. Thank you. All right. You have a chance for rebuttal. Mr. Halfand. Good morning, and may it please the Court, Bill Halfand for the City of Baytown, and Officer Barry Calver. Before I get to the substance, let me address the procedural issue that counsel raised regarding the trial court's use of the videotape in combination with the amended complaint. I would note first that it's curious that the appellant points to the videotape when it helps the appellant's case, but then argues, as he just did here, that the trial court erred in considering the videotape. That's simply not the case. In Covington v. Madisonville in 2020, which is cited at the appellee's brief at page 8, this court held that the use of a body-worn video camera is an appropriate consideration in determining a motion to dismiss. In fact, at the page 3 of the trial court's memorandum opinion, which the court would recognize, I'm sure, is quite thorough, which I believe is record page 260, but I'm trying to interpolate that backwards. The district judge pointed out, quote, plaintiff refers to Officer Calvert's body camera and dashboard camera in his amended complaint, and the contents of the footage are central to his claims. Therefore, it is appropriate to consider the footage in reviewing plaintiff's claims, and Judge Hanen cited two more recent cases from this circuit on that issue. Then, turning to the substantive issues of the case, I should acknowledge that I rarely quote the American Civil Liberties Union for anything, except we do find common ground on what the ACLU calls its bust card. For decades now, the ACLU has provided a small card to people that advises them on how to act when they're stopped by the police. Two of the points on the bust card are salient here. One, stay calm, be polite, do what the officer says. Two, do not interfere with or obstruct the police in their efforts. That is a practical application of what this court has held on numerous occasions, not the least of which was in Smith v. Heap in 2022, cited throughout the appellee's brief, that the most dangerous time in every traffic stop is from the initiation until the suspects or subjects are deemed safe and cooperative, or at least restrained temporarily. And the answer to Your Honor's question, Judge Smith, as to when did the resistance start, is found at record page 283, in which Judge Hanen specifically stated, Appellant resisted arrest and defied Officer Calvert from the moment Appellant exited his vehicle until Appellant was finally handcuffed. And that comes straight from the video. Now, there wasn't much talk about the stop, and I think that that's probably because one can't reasonably question the constitutionality of the stop, let alone the application of immunity, even if there is a question of the constitutionality, both the red light and the BOLO, the be on the lookout for a similarly identified vehicle, provided reasonable suspicion for a Terry stop to investigate. And while it is correct to say that what might have happened had Mr. and Ms. Benford complied with Officer Calvert's instructions might have been the issuance of a moving violation for running a red light, that doesn't insulate Mr. Benford from his own conduct, or in fact misconduct, in defying Officer Calvert from the very start up until the time Officer Calvert had to use force to take Mr. Benford into custody. If the stop was constitutional, and it was, then the use of force to detain Mr. Benford was, and this court en banc, as early as 1989, expressly held that an officer's use of force to overcome resistance to arrest does not implicate constitutionally protected interests. That's Johnson v. Morell, cited in the appellee's brief at page 20. As I said, at record 283, the district court found that Mr. Benford resisted arrest at all times from the moment of the stop until he was handcuffed. Now, if the complaint of the use of force is being grabbed, pushed, or even knocked down by Officer Calvert, the constitutionality of that force is to overcome Mr. Benford's video-proven resistance is, as the trial court observed in this court's holding in 2022 in Stolese v. Sterritt, which I would respectfully submit also answers Judge Jones' question, what is an officer to do when an individual refuses a command to stop and participate in the investigatory stop? Ms. Solis was such an individual she was eventually either knocked down or fell down while attempting to evade the police. This court found that the use of force by Officer Sterritt to detain her was within constitutional authority. Mr. Johnson tells us that there should be some gradual escalation in what the officer does. I don't think he explained to us what those gradual steps might be, but that's his position. Yes, sir. As this court has said repeatedly, measured and ascending use of force and the measured and ascending use of force is in response to the resistance. Again, we can analogize Mr. Benford's initial conduct as similar to in the Solis v. Sterritt case, and what we see on the video is Officer Calvert using what are called open-hand techniques. He's attempting to grab Mr. Benford, he's attempting to hold Mr. Benford, and so that would be what law enforcement officers are taught is the second lowest level of a use of force other than verbal commands, which of course Officer Calvert had already exhausted with no avail. The next use of force, if the complaint is the canine involvement, the answer to whether that is appropriate measured and ascending use of force in this instance lies in the trial court observation at record 159, it's in the video, record 159, it's record 283 where Judge Hainan observed it, that Officer, this is a quote, Officer Calvert only deployed the canine after the appellant's wife grabbed at Officer Calvert's holster area. Now, I'm sure it should come as no surprise to police officers that, I'm sorry, to judges and civilians, that police officers are trained that when someone engages the area of their firearm, this is my term, not training, all bets are off. That is somebody who may be attempting to retrieve a deadly weapon from the officer by one, disarming the officer, and two, arming themselves. And the video shows at record 159 specifically at 47 seconds that that's exactly what Mr. Benford's wife did. She grabbed right at the holster area of Officer Calvert's belt as he is leaning over Mr. Benford. And that is the answer, if I may, Judge Smith, to your question, of what does the officer have to say? I would respectfully submit that as a matter of Fourth Amendment jurisprudence, at that point, the officer doesn't have to say anything to the suspect because Mr. Benford was not the threat at that moment. His wife was. But what Officer Calvert needed to do was he needed to free himself up to protect his weapon and to arrest the woman who he thought was attempting to grab it. So the verbal call that's clear on the video is assist, the dog comes in, and the dog takes over maintaining Mr. Benford. Mr. Benford has all kinds of interesting arguments about what might have happened, but at the end of the day what he got were some superficial bite marks as the dog maintained Mr. Benford on the ground until Officer Calvert could, in 1 minute and 48 seconds, subdue Mr. Benford's wife, handcuff Mr. Benford's wife, go back to his car, get a second set of handcuffs, and then attempt to handcuff Mr. Benford, who the video shows continued physical resistance while the dog was present and Officer Calvert attempted to handcuff him. Can you talk about the reference to the out command? Yes, there is a verbal command on the video where Officer Benford returns and is attempting to handcuff, I'm sorry, Officer Calvert returns and attempting to handcuff Mr. Benford. What was that command? It was not the word out. That is the command to disengage. But what was the word used? I don't remember the word, Judge, but my understanding is that is the command to disengage. I would know if that's not in the record and the District Court didn't attempt to address that because the District Court observed I'm sure you, sorry to interrupt, but I want to make sure I understand, I'm sure you see the video more than once. What is this term that I'm referring to? Fagosh? I'm sorry? It's a word that's used more than once. Yes, I don't recall the actual word. I do know that there was a command when Officer Calvert returned to allow Officer Calvert more freedom to attempt to handcuff Mr. Benford. I don't recall the word. I apologize. It is on the video. I'm sorry. Speak to the mic because I can't hear you. What was the, as far as you know, what was the word used? I don't recall what the word was. I just know that it was a signal to the dog to disengage. Oftentimes, canine officers use very unusual words or even made-up words so that an other individual cannot command their dog. I don't know what the word was. You're saying the record is silent on what the word was. The District Court did not address that because the District Court found that under this Court's holdings in Shumford v. Tupelo, cited at page 26 in the Oppelli's brief and also page 26, Escobar v. Monti, that both the, to Judge Smith's question, the Shumford case demonstrates the measured and ascending use of force and the Escobar case, the District Court observed involved a dog again, bite-holding an individual for about the same amount of time as in this case, even, and again in that case, even though the individual was disarmed until the officers could subdue the suspect. So, the District . . . Well, the magic words in Escobar were that it's okay to use . . . continue to use the dog if the suspect, quote, still posed a threat. Isn't that what that opinion says? Sure. But in this case, the difference is I think . . . I'm not suggesting whether there was a threat here or not, but that's what Escobar says as I read it. Well, except that in Escobar, the plaintiff claimed that he no longer posed a threat because he was disarmed. The court found that he was still a threat because he had been resisting. And so, yes, there still has to be a threat. Here, the problem is it's compounded by the fact that a single officer must deal with two individuals, and so . . . So, it was . . . there was a potential threat here, if not an actual one. Indeed. With an officer making a spur-of-the-moment, spur-of-the- second decision. Yes, sir, and that's exactly . . . that's exactly tracked with Escobar, which is the court said even though in that case the plaintiff had been disarmed, he was still a potential threat. And that's what . . . exactly what I was just going to say. Appellant's counsel opines about what would have happened had there not been a dog there. I would be frightened to think what would happen if there had not been a dog there with one person attempting to grab the officer's gun while another person was fighting with him on the ground. But that's pure speculation. What we have to do and what this court does is apply the presumption of immunity, which is, is there something that tells the trial court, certainly not, or is there something that can be demonstrated to this court, shows that no reasonable officer could have felt that threat. And I would submit that that would be foolish. Okay, but just to be clear, I thought the theory of this case was not that the threat was ongoing the entire time, but that an out command was actually issued. It's just that the dog didn't comply. It would seem to me that if there is a threat, you wouldn't do the out command. You'd want the dog to continue. This officer tried to say out. The dog just didn't comply. Do you want to make sure I understand the case? First, the answer to your question is yes, I agree with you. I want to explain. What I was addressing was Judge Smith's motion. You were talking about another case. He had to get Mr. Benford's wife safe, subdued. Right. That's earlier. I'm talking about later in the video. Yes, Judge. To your point, when he returned... Once she was subdued. Yes. And to the... And again, all indications are he then felt like he was sufficiently in control to have the dog release and allow handcuffing, but the court will observe on the video that Officer Calvert continues to complain that Mr. Benford continues to resist. Or put another way, if Miss... Let's forget about it. If the dog hadn't been there, if Mr. Benford's wife hadn't been there, all indications are there would have never been a need for a dog deployment. Officer Calvert Just to be clear, because I know it's a period of time in the video. Once the wife is handcuffed, she eventually sits down as requested. All the man is doing is screaming about the pain. He's on the ground at that point. He's not resisting. He's trying to avoid pain. My understanding from the record is an out command is in fact issued. It's just for some reason the dog's not complying with the command. Is that... I believe that's the case Judge, but I want to be clear. I don't agree with the court's interpretation that he is no longer resisting. He is in pain from the dog. That's pain compliance, which is a common law enforcement technique. But when Officer Calvert attempts to handcuff him, you'll observe on the video he is fighting being handcuffed again. The difference at that point... I'm not sure I can go with you on that. He's being... He's screaming. So your theory has to be either A, he's screaming because he's in pain and if he's resisting anything it's resisting pain, or he's pretending, which strikes me as a bit fanciful. No, I think he's in pain, Judge, but he is continuing to fight... He's resisting in the sense that he's... Now whether that's because of his pain or because of a conscious effort to resist probably doesn't matter because by then any use of force of which he's complaining has already occurred. I don't think he's complaining about Officer Calvert's final efforts to handcuff him. I'd like to... I'll just be honest. Without an out command, I'm not sure I'm with you. Well, but except the problem with that, Judge, is the question is one of qualified immunity. And so the issue is, is there case law that says that there's a moment... I thought the whole point of Cooper was that the use of the dog has to cease once there is compliance. I take it your theory is there's no compliance? Compliance? Yes, but I think compliance includes being rendered safe. To a police officer, compliance... Somebody who's been fighting who says I'm no longer going to fight is not compliant. That's Mr. Escobar in the Escobar case. He dropped the weapon. His argument was I dropped the weapon. Now I'm compliant. And yet the dog continued to bite me. The court said no. You're not compliant until you're subdued. And in this case, that means handcuffed. And that's where I think that any difference of opinion we might have, Judge, is resolved, which is the presumption of immunity. The appellate cites the Sly case, because in the Sly case, and Judge Smith was on the panel, the court found that Ms. Sly was not suspected of any crime, and she did not pose an immediate safety threat to any officer or others. However, and so the court, this court found that was an unconstitutional use of the dog. However, the court still found immunity, because the court found that the law was not clearly established to the level at which would inform an officer when the dog must disengage. Whether it's because the dog doesn't follow the command or the officer doesn't give the command in a timely manner, there's no clearly established law in this circuit that would have told Officer Calvert that a minute and 12 seconds is okay, but a minute and 48 becomes unconstitutional. In the remaining time that I have, I'd like to speak quickly to the arrest question. Again, I pointed out in response to Judge Jones' question, Texas Penal Code 38.04a makes evading arrest its own offense. Mr. Benford posits that because he didn't believe the arrest was lawful, the detention was lawful, he could resist that. That's answered by this court's opinion in Ramirez v. City of Palacios in 2004, which is cited at the brief, page 18. The lawfulness question is an objective one. It's not an excuse for noncompliance, but even if that were the case, resisting arrest in  provides its own probable cause for arrest. This court so held in Ramirez v. Martinez in 2013 at page 18 of the briefing, and the statute itself specifically points out, the statute specifically precludes the assertion of an unlawful arrest as an affirmative defense. It doesn't matter because in 2022, this court held in Lofton v. Prentiss at page 19 of the brief, that even an actual affirmative defense to prosecution does not vitiate probable cause for an arrest. Again, Flores and Ramirez v. Martinez substantiate the basis for Officer Calvert's immunity here. I won't take up the court's time to address the claims against the city, except to point out that they're the same rote allegations this court routinely rejects. Governmental liability under Monell is the exception. It is the rare exception, and this appellant's counsel pleads the same things in every case in pointing out that five uses of a dog, which is a law enforcement tool, occurred without any finding of unconstitutionality as to any of them does not a claim against a governmental entity make. Thank you for the court's time. Okay. Thank you, sir. Mr. Johnson. May it please the court, a couple of notes. The first that I'll start with is where Mr. Helfand started about evidence and so forth. I just want to make a few notes about that. First, appellant never argued that the video was inadmissible. We rely on the video throughout. It's purely about whether the court should credit the factuality of the police report, which at this stage it should credit the complaint in the video, and to the extent that factual allegations in the police report, which is of course an unsworn document, are not in the allegations or not in the video, the court should not credit them. And that dovetails directly into the issue with respect to Ms. Wilson allegedly reaching for Officer Calvert's gun belt. First, appellant very much disputes that the video shows that she was reaching for his gun belt. I mean, that part of the interaction happened very quickly, and there was a lot of coverage over the body camera. So to say that the video definitively shows that she was objectively reaching for his gun belt over any presumption in favor of appellants at the pleading stage... He went after him, did she not? Physically? Can you repeat your question? I'm sorry. He went after the officer physically. It's not super clear. Well, if it obscured the body cam, I suppose that's because her body covered the body cam. Somebody's body covered the body cam. And Benford didn't cover his own body cam, did he? Because he was still working with the husband. Well, yeah, Mr. Benford could have been covering the body cam at the time of question because that's around the time when they're in the bushes. And again, the bite command is issued around 50 seconds. So I would encourage the court to look very carefully at those events around that time of the bite command. I viewed the video over 10 times. At a minimum, it's two against one. That much is clear. In other words, both individuals are being hostile towards the officer. Why is that just obviously dangerous? So, two answers to that. The first is that I wouldn't argue that both individuals are being hostile to the officer. I would say that Mr. Benford at all times was trying to walk away from the officer. He never at any point came back toward the officer and tried to engage with him. He was trying to walk away. Fair enough. He was not complying and the wife was engaging the officer in defense of the husband. That's still not a safe situation for the officer. The most that a felon will concede is some sort of engagement on Ms. Wilson's part. The extent of it and the effect of it, I think, are very much up in the air. Notably... At that level, we're not super humans here trying to scrutinize James Bond. We're talking about an officer on the beat trying to figure out how to deal with a hostile woman. Even if a man is walking away, the woman is hostile. Right. Even given that and I think this was evident in opposing counsel's presentation, very notably, there is no question, there is no argument at any point that Mr. Benford himself posed a threat to the officer. The only thing that appellee's counsel points to and tries to pin this whole justification on is actions by Ms. Wilson. So, if she posed a threat, there's some level of escalation of force that can be used against her. But that doesn't then immediately justify the use of force against Mr. Benford. And again, at the time the bite command was released, she was on the ground, he was in hand. So, he had used these lower force techniques that both of us have been talking about. Well, that's what's interesting though, is you're conceding that it was okay to use hands on Benford, the man, the appeal. Right? So, in other words, force was authorized. The question is what level of force. Is that... Correct. You're not here saying he should not have used hands. Correct. That's exactly correct. And the fact that the use of the dog is just one step down from deadly force. And it's frankly ludicrous to suggest that Mr. Benford only suffered superficial wounds. I would invite appellee's counsel to be bitten by that dog for a minute and 40 seconds while it's jarring and tearing at him and say that that's a superficial bite. That's... Yeah. So, yeah. So, between the lack of threat from Mr. Benford, the speed of the escalation when there were other tools available, and the duration of the bite, we would ask this Court to reverse our demand. Thank you, Your Honors. All right. Thank you very much. Court is in recess until 9 o'clock tomorrow morning.